FILED

1  **KERSHAW, CUTTER & RATINOFF, LLP**
   William A. Kershaw (State Bar No. 057486)
2  Email: wkershaw@kcrlegal.com
   C. Brooks Cutter (State Bar No. 121407)
3  Email: bcutter@kcrlegal.com
   Stuart C. Talley (State Bar No. 180374)
4  Email: stalley@kcrlegal.com
5  John R. Parker, Jr. (State Bar No. 257761)
   Email: jparker@kcrlegal.com
6  401 Watt Avenue
   Sacramento, California 95864
7  Telephone: (916) 448-9800
8  Facsimile: (916) 669-4499

9  **WEXLER WALLACE LLP**
   Mark J. Tamblyn (State Bar No. 179272)
10 Email: mjt@wexlerwallace.com
   Ian J. Barlow (State Bar No. 262213)
11 Email: ijb@wexlerwallace.com
12 455 Capitol Mall, Suite 231
   Sacramento, California 95814
13 Telephone: (916) 492-1100
   Facsimile: (916) 492-1124
14

**EDL**

**CV 09      5443**

15 Attorneys for *Plaintiff*

16

17                    UNITED STATES DISTRICT COURT

18                 NORTHERN DISTRICT OF CALIFORNIA

19 | REBECCA SWIFT, on behalf of herself and all others similarly situated, | Case No. _____ |
|---|---|
20 | | **CLASS ACTION** |
21 | Plaintiff, | |
   | | **COMPLAINT FOR VIOLATIONS OF:** |
22 | v. | **(1) THE UNFAIR COMPETITION LAW;** |
   | | **(2) THE CONSUMERS LEGAL** |
23 | | **REMEDIES ACT; AND** |
   | ZYNGA GAME NETWORK INC.; and | **(3) UNJUST ENRICHMENT.** |
24 | FACEBOOK, INC. | VIA FACSIMILE |
25 | Defendants. | **JURY TRIAL DEMANDED** |
26
27
28

-1-

Plaintiff Rebecca Swift ("Plaintiff"), individually and on behalf of all others similarly
situated, alleges by and through her attorneys, upon information and belief, as follows:

**NATURE OF THE ACTION**

1.      This case seeks to remedy a fraudulent scheme perpetrated by the Defendants who
utilize social networking sites such as Facebook and MySpace, to lure unsuspecting consumers
into signing up for services and goods that they do not want or need. Specifically, the Defendant
Zynga Game Network Inc. ("Zynga") is in the business of developing and making available to
users of Facebook, MySpace, and other social networking sites a large variety of popular on-line
games including but not limited to Mafia Wars, Zynga Poker, FarmVille, Vampires, YoVille!,
and Roller Coaster Kingdom. Although users are allowed to play the Defendants' games free of
charge, the Defendants have developed various methods to "monetize" these otherwise free
games.

2.      Specifically, the games are designed to allow players to earn "virtual currency" in
each game. Players are then able to spend this virtual currency to purchase virtual on-line goods,
unlock new levels of the game, or otherwise make the game more enjoyable. Virtual currency
can be earned by accomplishing various tasks in the game or by simply purchasing it with real
money directly from Zynga. However, a third way to obtain virtual currency is by participating
in one of the many advertisements or "special offers" that are made available to users of each
game. It is these offers, generally referred to in the industry as "lead-gens" (lead generators) that
have caused widespread deception of players of Zynga games.

3.      For example, FarmVille is a game that is promoted and made available through
Facebook's social networking site. This game presents a "virtual world" where players can start
and manage their own virtual farmers. In this game, users must have game cash to expand their
farm, purchase supplies, etc. Zynga allows FarmVille players to purchase this virtual cash
directly with a credit card or, alternatively, the user can respond to a special offer or
advertisement that appears within the game.

4.      One of the lead-gens that often appeared on various Zynga games is an on-line "IQ
test." The special offer indicates that the user can earn additional virtual currency by obtaining a

-2-

CLASS ACTION COMPLAINT

1  certain score on an on-line IQ test. To take the test, the consumer must provide their cell phone

2  number and they are told that the results of the test will be sent to them via text message.

3  However, what the user does not know is that by providing their cell phone number, they have

4  unwittingly subscribed to a useless SMS service and will be billed on a monthly basis through

5  their cell phone bill. Users who manage to discover the obscure charge on their phone bill are

6  then met with hurdles as they attempt to cancel the service and/or obtain a refund. This is just an

7  example of the many deceptive Zynga offers and advertisements that have harmed consumers

8  throughout the United States.

9      5.    Recently, executives of Zynga admitted that lead-gens appearing through its game

10  applications were designed to mislead consumers and generate revenue for its business. In a

11  recent speech, Zynga CEO, Mark Pincus, described how shortly after founding Zynga he

12  desperately needed revenue in order to keep control of his company. He then boasted that this

13  revenue was primarily generated through scams such as the one described above:

14          "Like I needed the revenue now. So, so I funded the company myself but I

15          did every horrible thing in the book to just get revenues right away. I mean

16          we gave our users poker chips if they downloaded this wiki toolbar, which

17          was like . . . I don't know. I downloaded it once and I couldn't get rid of it.

18          We did anything possible to just get revenues so that we could grow and be a

19          real business."

20      6.    After making this public admission, many media outlets began to question Zynga

21  and Facebook's practices surrounding these advertisements. In response to this controversy, in

22  November 2009 Zynga purports to have banned all advertisements and special offers promulgated

23  through its games. In fact, Zynga's CEO recently acknowledged that *all* of the advertisements

24  published through their site would be banned *"until we see any that offer clear user value."*

25  Additionally, Facebook has recently amended its user policies to attempt to prohibit the type of

26  on-line advertisements that have misled so many people. However, despite taking these steps,

27  neither Zynga nor Facebook have offered to reimburse any of the millions of users who have been

28  misled by the bogus advertisements and special offers promulgated through their applications.

-3-

1

## JURISDICTION AND VENUE

2   7.   The aggregate amount in controversy for the Class exceeds $5,000,000. Plaintiff

3   seeks to certify a nationwide class consisting of individuals who reside in all 50 states.

4   Defendants, Facebook, Inc., and Zynga Game Network, Inc., are Delaware corporations with their

5   principal places of business in Palo Alto and San Francisco, respectively. Diversity, therefore,

6   can be found because, under U.S.C. §1332(d)(2)(A), a member of the class of Plaintiffs is a

7   citizen of a state different from any Defendant. No exceptions to jurisdiction under U.S.C.

8   §1332(d) apply. Accordingly, this Court has diversity jurisdiction pursuant to 28 U.S.C.

9   §1332(d) also known as the Class Action Fairness Act.

10   8.   Venue in this District is proper in that Defendants do business in the District,

11   maintain their principal places of business in the District, and the Plaintiff resides in the District.

12

## INTRADISTRICT ASSIGNMENT

13   9.   Pursuant to Local Rules 3-5(b) and 3-2(d), assignment to the San Francisco

14   Division is proper because defendant Zynga Game Network, Inc. maintains its principal place of

15   business in San Francisco County and a substantial part of the events or omissions that give rise

16   to Plaintiff's claims occurred in San Francisco County.

17

## THE PARTIES

18   10.   Plaintiff Rebecca Swift is a resident of Santa Cruz, California. During the class

19   period Mrs. Swift used various Zynga game applications within the Facebook network, including

20   Farmville, Mafia Wars, YoVille!, and Roller Coaster Kingdom. In each of these applications,

21   Zynga attempted to induce her to earn virtual in-game currency by accepting "special offers"

22   from Zynga advertisers. The Plaintiff was misled by the "special offers" promulgated by the

23   Defendants and, as a result, has suffered damages as described below.

24   11.   Defendant Zynga Game Network Inc. is a Delaware corporation with its principal

25   place of business at 365 Vermont St., San Francisco, California 94103.

26   12.   Defendant Facebook, Inc., ("Facebook") is a Delaware corporation with its

27   principal place of business at 156 University Ave., Palo Alto, California 94301.

28

-4-

1   13. Plaintiff alleges, based on information and belief, that at all relevant times each of

2 the Defendants named herein was an agent, employee, manufacturer, supplier, distributor,

3 designer, engineer, retailer, seller, franchisee, representative, partner, and related or affiliated

4 entity or providers of services to or on behalf of each of the other Defendants. On information

5 and belief, Plaintiff alleges that Defendants and other unnamed third parties conspired and

6 combined among themselves to commit the acts complained of herein and that each was the joint

7 venturer and/or partner of the other.

8              **FACTS**

9 **A. General Allegations**

10   14. Facebook is the largest social networking site in the world. Facebook is estimated

11 to have more than 200 million individual subscribers and annual revenues of approximately $500

12 million per year. As part of Facebook's service, users are allowed to play on-line games against

13 other Facebook users. The most popular games played by Facebook users are Mafia Wars,

14 YoVille!, FarmVille, and Poker.

15   15. Zynga promotes itself as the top social gaming company on the web, providing a

16 network of on-line games that can be played by subscribers of networking sites such as Facebook

17 and MySpace. Mafia Wars, YoVille!, FarmVille, and Poker are among the many games that are

18 published and hosted by Zynga. It is estimated that more than 40 million individuals throughout

19 the United States are active players of Zynga's games.

20   16. There is no cost to users who want to play Zynga's games. However, to earn

21 revenues, Zynga has intentionally designed its games so that they can be "monetized." What this

22 means is that all of Zynga's games allow users to collect virtual currency that can be used

23 throughout the game to purchase virtual items or unlock options that make the games more

24 enjoyable. The only way that this virtual currency can be collected is by 1) earning it on-line by

25 accomplishing virtual tasks; 2) buying it directly from Zynga with a credit or debit card; or 3)

26 responding to an on-line advertisement or special offer that is presented during the game.

27   17. Most, if not all, of the on-line advertisements presented through Zynga are scams.

28 The advertisements are highly misleading and often result in users subscribing to goods or

1    services that they do not want or need. Consumers who attempt to cancel services or obtain

2    refunds are then met with roadblocks designed to thwart cancellation and/or refunds or otherwise

3    "save" the customer.

4        18.    Over the past four years, Zynga and Facebook have generated enormous profits

5    through these false and misleading special offers. In fact, Andre Trader, co-founder of Zynga,

6    has admitted that its on-line ads are a large reason for Zynga's growth and now account for up to

7    one-third of its revenue. With industry sources estimating annual revenue from $100 million to

8    $250 million per year, this means that Zynga has potentially obtained $33 to $84 million per year

9    from consumers responding to the "special offers" it promotes and promulgates through its on-

10   line games.

11       19.    Additionally, Plaintiff is informed and believes that Facebook shares a substantial

12   portion of the revenue generated from the false and misleading advertising promulgated through

13   Zynga games. In fact, it is estimated that from 10 to 20 percent of Facebook's $500 million in

14   annual revenue is generated through games published by Zynga. Plaintiff is further informed and

15   believes that Facebook is fully aware of the false and misleading nature of the advertising

16   promulgated through Zynga's applications and that, despite this, it actively engages in promoting

17   Zynga's games to the public.

18   **B.    Facts Specific To Plaintiff**

19       20.    During the class period, Plaintiff, Rebecca Swift, has used various Zynga game

20   applications within the Facebook network, including FarmVille, Mafia Wars, YoVille!, and

21   Roller Coaster Kingdom. In each of these applications, Zynga has attempted to induce her to earn

22   virtual in-game currency by accepting "special offers" from Zynga advertisers.

23       21.    In or around April 2009, Mrs. Swift provided her cell phone number to a Zynga

24   advertiser and/or lead generator in order to be texted a "code" that she could redeem for

25   "Yocash"—virtual currency within Zynga's Yoville application. Neither Zynga nor Zynga's

26   advertisers and/or lead generators informed Mrs. Swift that providing her cell phone would result

27   in any charges to her phone bill. On or about April 16, 2009, and three times afterwards, Mrs.

28   Swift's cell phone was charged $9.99 without her knowledge or consent.

-6-

22.     On or about June 14, 2009, Mrs. Swift observed an advertisement for a "risk-free Green Tea Purity Trial" while playing the game YoVille!. The advertisement indicated that Plaintiff could earn virtual YoVille! cash (or "YoCash") if she participated in a "risk free trial" for a green tea herbal supplement. The advertisement indicated that the Plaintiff could cancel the trial anytime within 15 days of her initial order. To participate in the program, Plaintiff provided her debit card number and was charged $5.95 for shipping and handling.

23.     Mrs. Swift sent an email to the apparent manufacturer of the supplements asking to cancel her "Green Tea Purity Trial" on or about June 24, 2009, after she received, mailed from China, a package of 30 green tea pills and three tea bags.

24.     On or about July 4, 2009, "Support Green Tea" emailed Mrs. Swift, informing her that she would be charged $79.95, despite Ms. Swift's specific prior request to cancel her trial offer. Ms. Swift was unsuccessful at any further attempts to contact "Support Green Tea" via telephone. On July 6, 2009, Ms. Swift's bank account was charged $79.95, as well as a $2.38 "foreign transaction fee." On July 20, 2009, Ms. Swift's bank account was charged $85.90, as well as another $2.38 foreign transaction fee. Sometime afterwards, she received, again mailed from China, a package of 30 green tea pills and three tea bags. The materials shipped to Mrs. Swift are worth far less than the $165.85 charged to Mrs. Swift's account after she requested to cancel the "free" trial offer that she accepted in exchange for "Yocash" in Zynga's Yoville application. Despite repeated efforts, Mrs. Swift has been unable to obtain a refund of any of the amounts charge to her for this "risk free" trial.

25.     Plaintiff is informed and believes that Facebook and Zynga both profited and shared the funds that were taken from Plaintiff and that both were aware, or should have been aware, of the false and misleading nature of the advertisement presented to Plaintiff. Plaintiff also alleges that both Facebook and Zynga actively encouraged Plaintiff to accept the advertisement at issue through the design and promotion of their on-line games. As such, Plaintiff alleges that Facebook and Zynga are jointly and severally liable as co-conspirators, joint venturers, and aiders and abettors.

-7-

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and all others similarly situated. Plaintiff seeks to represent the following Class ("Class"):

> **All persons in the United States who from November 2005 acquired or accumulated game currency or other items within a Zynga game application in response to any lead-generating offer or advertisement presented through that application and who charged money as a result thereof.**

25.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the Class are business entities for purposes of Plaintiff's claim for relief under the Consumers Legal Remedies Act, Civil Code § 1750, *et seq*. Also specifically excluded are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

26.    **Numerosity - Fed.R.Civ.P. 23(a)(1)** - Members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed class contains more than 100,000 members. The precise number of class members is unknown to Plaintiff. Class members are likely to be known by Defendants, however, and thus, may be notified of the pendency of this action by mail, email, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

27.    **Existence and Predominance of Common Questions of Fact and Law – Fed.R.Civ.P. 23(a)(2), 23(b)(3)** - There are questions of law and fact common and of general interest to the class. Said common questions include, but are not limited to, the following:

a.    Whether Defendants' conduct as described herein constitutes an unfair, fraudulent or unlawful business practice prohibited by California Business and Professions Code Sections 17200 *et. seq;*

-8-

b. Whether the advertisements promulgated and promoted through Zynga's game applications were likely to deceive the public;

c. Whether Zynga and Facebook conspired to mislead consumers ;

d. Whether Zynga and Facebook acted in concert and/or were joint venturers in connection with advertisements promoted through Zynga's applications;

e. Whether Facebook had a duty to protect users from false and misleading advertising promoted through Zynga's applications;

f. Whether Facebook and Zynga knew or reasonably should have known that the advertising promulgated through Zynga game applications were likely to deceive the public;

g. Whether the Defendants' uniform conduct as described herein violates California's Consumers Legal Remedies Act;

h. Whether Defendants have been unjustly enriched as a result of the conduct described herein;

i. Whether Plaintiff and class members are entitled to restitution, declaratory, and injunctive relief as sought herein.

j. Whether Defendants omitted material facts in connection with their lead-gen offers.

k. Whether Defendants' conduct caused damage to Plaintiff and members of the Class, and the appropriate measure of such damages;

l. Whether Plaintiff and the Class are entitled to restitution.

28. Defendants' defenses, to the extent that any such defenses apply, are applicable generally to Plaintiff and the entire Class and are not distinguishable as to proposed Class members.

29. **Typicality – Fed.R.Civ.P. 23(a)(3)** - Plaintiff's claims are typical of the claims of the Class as a whole, all of whom have sustained and/or will sustain damages as a proximate or legal result of the common course of conduct of Defendants. Plaintiff's claims are typical of the Class because Defendants subjected all Class members to the same course of conduct.

-9-

30.  **Adequacy – Fed.R.Civ.P. 23(a)(4)** - Plaintiff will fairly and adequately protect the interests of the Class and has no interest antagonistic to those of the Class. Plaintiff has retained counsel that are highly experienced in the prosecution of complex consumer class action litigation.

31.  **Superiority – Fed.R.Civ.P. 23(b)(3)** - A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and members of the class. Although the injury suffered by each individual class member likely ranges from $100 to $300, injury of such magnitude is nonetheless relatively small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication economy of scale and comprehensive supervision by a single court.

32.  In the alternative, the Class may be certified under Rule 23(b)(1) and/or (b)(2), because:

   (a) The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudication with respect to individual Class members that would create incompatible standards of conduct for Defendants;

   (b) The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

-10-

(c) Defendants have acted or refused to act on the grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CLAIM FOR RELIEF
### (Against All Defendants for Violation of the Unfair Competition Law)

33.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

34.    Defendants' acts and practices, described herein, constitute unlawful, unfair or fraudulent business practices in violation of the Unfair Competition Law, Business & Professions Code sections 17200 et seq.

35.    Defendants' acts and practices, described herein, violate the CLRA, Civil Code section 1770, et seq., constitute unlawful, unfair or fraudulent business practices in violation of the Unfair Competition Law, Business & Professions Code sections 17200 et seq.

36.    The above-described unfair, unlawful and fraudulent business practices conducted by Defendants present a threat and likelihood of harm and deception to members of the Class and the general public in that Defendants have systematically perpetrated and continue to perpetrate the unfair, unlawful and fraudulent conduct upon members of the public by engaging in the conduct described herein. The utility of Defendants' conduct, if any, is outweighed by the harm it has caused to Plaintiff and the Class.

37.    Plaintiff and the Class have been lost money and were injured by and as a result of defendants' unfair and unlawful practices.

38.    Pursuant to Business and Professions Code sections 17200, 17203 and 17204, Plaintiff, on behalf of himself, the Class and the general public, seeks an order of this Court: enjoining Defendants from continuing the unfair business practices described herein. Plaintiff additionally requests an order awarding Plaintiff and the Class restitution of all monies wrongfully acquired from the class by means of such unlawful acts and practices, so as to deter Defendants and to rectify Defendant's unfair and unlawful practices and to restore any and all

-11-

1    monies to Plaintiff and the Class and to the general public, which are still retained by Defendants,

2    plus interest, attorneys' fees and costs pursuant to, *inter alia*, Code of Civil Procedure section

3    1021.5.

4

5    ## SECOND CLAIM FOR RELIEF
     **[Against All Defendants for Violation of the Consumers Legal Remedies Act]**

6         39.    The allegations of the preceding paragraphs are incorporated by reference as if

7    fully set forth herein.

8         40.    Defendants provide "services" within the meaning of Civil Code sections 1761(a),

9    1761(b) and 1770.

10        41.    Defendants are "persons" within the meaning of Civil Code sections 1761(c) and

11   1770.

12        42.    Users of Defendants' services, including Plaintiff and the Class, are "consumers"

13   within the meaning of Civil Code section 1761(d) and 1770.

14        43.    Plaintiff's and each and every Class member's use of the services offered by

15   Defendants constitute "transactions" within the meaning of Civil Code sections 1761(e) and 1770.

16        44.    Defendants' unfair or deceptive acts or practices as described herein were

17   undertaken by Defendants in transactions intended to result or which resulted in the sale of goods

18   and services to consumers, and were intended to induce, and did in fact induce, Plaintiff and the

19   Class to purchase for personal use such good and services, which they would not have otherwise

20   purchased. Further, Defendants' suppression and/or concealment of the material facts as

21   described herein was calculated to induce, and did in fact induce, Plaintiff and the Class to

22   provide valuable consideration to Defendants.

23        45.    Defendants' joint and concerted practices, acts and course of conduct as described

24   herein violates the Consumers Legal Remedies Act ("CLRA") in that they caused the following

25   unfair and deceptive practices to occur:

26             A.    Defendants "represent[ed] that goods or services . . . have sponsorship,

27                   approval, characteristics, ingredients, uses, benefits, or quantities which they

28                   do not have;" in violation of section 1770(a)(5) of the CLRA

                                              -12-

1          B.     Defendants advertised goods and services with the intent not to sell them as

2                  advertised. Civ. Code § 1770(a)(9);

3          C.     Defendants represented that a transaction confers or involves rights, remedies,

4                  or obligations which it does not have or involve, or which are prohibited by

5                  law. Civ. Code § 1770(a)(14); and

6          D.     Defendants "represented that the transactions were supplied in accordance with

7                  a previous representation when they were not" in violation of section

8                  1770(a)(16) of the CLRA

9          46.    Defendants' practices, acts and course of conduct as described above, are likely to

10   mislead a reasonable consumer acting reasonably under the circumstances to her or her detriment.

11   In engaging in their violations of the CLRA, Defendants actively concealed and failed to disclose

12   material facts about the true characteristics of the transactions leading to Plaintiff's and the Class

13   Member's response to lead-gen offers.

14         47.    Defendants engaged in these unfair and/or deceptive acts and practices with the

15   intent that they result, and which did result, in the transactions alleged herein. As a direct and

16   proximate result of Defendants' violations of law, Plaintiff and the Class have been injured.

17   Pursuant to the provisions of Civil Code section 1782, Plaintiff has provided notice to Defendants

18   in conjunction with the filing of this complaint (although the Complaint is an appropriate notice

19   of violations) of her intention to seek damages under Civil Code sections 1750 et seq. unless these

20   Defendants correct, repair, replace or otherwise rectify Defendants' violations of the CLRA. The

21   notice demands that Defendants take steps as are appropriate to rectify the violations and

22   requiring Defendants to give notice to all affected consumers of their intent to act. If Defendants

23   fail to adequately respond to Plaintiff's demand within thirty (30) days from the date the notice is

24   served, Plaintiff will amend this complaint to seek actual and punitive damages according to the

25   CLRA.

26         48.    By the filing of this Complaint, Plaintiff seeks an order enjoining the unlawful

27   practices described herein and an Order requiring Defendants to notify the Class of their

28   violations of the CLRA and the remedy they will provide to them. Plaintiff and the Class are

-13-


3. That pursuant to sections 17203 and 17204 of the Business and Professions Code, Defendants be permanently enjoined from performing or proposing to perform any of the aforementioned acts of unfair and deceptive business practices;

4. That pursuant to section 17206 of the Business & Professions Code, section 1021.5 of the Code of Civil Procedure, and the Court's inherent equitable power, Plaintiff recover her costs, including costs of suit, and reasonable attorneys' fees; and

5. That Plaintiff be entitled to such other and further relief as this Court may deem just and proper.

## JURY DEMAND

To the full extent available, Plaintiff demands a trial by jury.

Dated: November 17, 2009      **KERSHAW, CUTTER & RATINOFF**

By _____
     STUART TALLEY

William A. Kershaw
C. Brooks Cutter
John R. Parker, Jr.
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

Mark J. Tamblyn
Ian J. Barlow
**WEXLER WALLACE LLP**
455 Capitol Mall, Suite 231
Sacramento, California 95814
Telephone: (916) 492-1100
Facsimile: (916) 492-1124

Attorneys for Plaintiff

-15-

## DECLARATION OF STUART C. TALLEY PURSUANT TO CIVIL CODE § 1780(c)

I, STUART C. TALLEY, declare as follows:

1.     I am an attorney at law duly licensed to practice before all courts of the State of California, and am a partner in the firm of Kershaw, Cutter & Ratinoff, counsel of record for Plaintiff. I have personal knowledge of the matters set forth below and if called as a witness could and would competently testify thereto.

2.     I am informed and believe that venue is proper in this court under Civil Code § 1780(c) based on the following facts:

(a)     Defendants have performed transactions at issue in this action, or have obtained financial benefit from such transactions, at all times relevant to this action, in the Northern District of California;

(b)     At all relevant times herein, Plaintiff resided in the Northern District of California.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct and that this declaration was executed on November 17, 2009 in Sacramento, California.

STUART C. TALLEY

-16-